UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    CRIMINAL NO. 14-CR-20561

                                       HON. PAUL D. BORMAN

WILLIE QUAWN BROWN,

        Defendant,

_____/

## United States' Response Opposing the Defendant's Motion for Compassionate Release or Request for Home Confinement

Defendant Brown is a former violent gang member ("Bloods") whose criminal history began at age 12 (PSR, ¶ 62, 65). His criminal history includes felony convictions for drug possession, drug trafficking, malicious destruction of property, assault with intent to do great bodily harm, assault with a dangerous weapon and home invasion-3rd degree. In this case, he was convicted of possession of a stolen firearm. The facts involved a drive-by shooting into an unoccupied vehicle in the City of Ypsilanti. Brown was identified as the shooter. During a search of his home, Michigan State Troopers recovered a loaded Keltec 9mm gun, which was identified through ballistic testing as the gun used in the car shooting (PSR, ¶12). Brown was

1

sentenced to 92 months' imprisonment and 3 years' supervised release (ECF No. 20, Page ID.70).

Brown began serving his current sentence on May 18, 2015. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Brown does not qualify for compassionate release. Although Brown's heightened risk from Covid-19 based on his asthma, obesity, type II diabetes, hypertension and myocardial infarction qualifies as an "extraordinary and compelling reason[s]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Brown is not otherwise eligible for release (Exhibit 1). Brown's offense and his prior criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). In this case, Brown was convicted of possession of a stolen firearm, which he used in a shooting incident.  He was under parole supervision at the time of the shooting (PSR, § 51). His criminal history includes other crimes involving violence and damage to property. On more than one occasion he has absconded from parole (PSR, ¶ 41,42). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.  Brown has only served 5 years, 3 months (approximately 63 months) of his 92-month sentence.  Release prior to the expiration of his sentence would not promote respect for the law or provide just punishment for the offense. Brown's conduct in firing a gun into an unoccupied

vehicle was a dangerous and violent act which could have caused great harm to others. Brown has completed only two education courses while in prison and has failed to enroll in a practical life skills class, which will assist in his transition back into the community. Further, he has not obtained any vocational training to enable future employment. These factors, combined with his disciplinary record while in prison, have resulted in his designation of high-risk recidivism by the BOP (Exhibits 2, 6). This suggests that Brown's release at this time would be premature and the public would not be protected from Brown's further crimes.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Brown, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of September 11, 2020, this process has already resulted in at least 7668 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least 116 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing

inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—
the Court should deny Brown's motion for compassionate release.

## Background

Brown has an extensive criminal history involving violence and drugs, which
began in 1995, at the age of 12, when he was arrested for assault and battery and has
continued through his arrest in this case at age 32. Between 1995 and 1999, he
appeared in the Washtenaw County (Michigan) Juvenile Court and incurred
adjudications for six misdemeanors and two felonies. He was also cited on numerous
occasions for status offenses and probation violations (PSR, ¶ 62).  In November
2000, Brown  began a long string of criminal activity incurring convictions for
possession of cocaine (PSR, ¶ 28); felony fleeing and eluding-3rd degree and
possession of marijuana (PSR, ¶ 34); felony possession of cocaine; felony
delivery/manufacture of  cocaine (PSR, ¶ 40); assault with intent to do great bodily
harm; felony possession with intent to deliver on school property or library – cocaine
(PSR, ¶ 42); assault with intent to do great bodily harm (PSR, ¶ 45); use of cocaine
(PSR, ¶ 46); assault and battery (PSR, ¶ 48) and assault with a dangerous weapon,
home invasion-3rd degree (PSR, ¶ 49).  Brown also had several other arrests for
assault and drug charges (PSR, ¶ 56-59).

In this case, Brown fired shots into an unoccupied vehicle in the City of Ypsilanti.
During a search of his home, Michigan State Troopers recovered a loaded Keltec

9mm gun, which was used by Brown in the car shooting. Brown was charged with felon in possession of a firearm following three serious felony offenses, in violation of 18 U.S.C. §922(g)(1) and §924(e) and  felon in possession of ammunition following three serious felony offense convictions (ECF No.1, Page ID. 1). The charge carried a mandatory minimum period of imprisonment of 180 months. Brown was detained pending trial. On February 4, 2015  Brown entered his guilty plea to a first superseding information charging possession of a stolen firearm, in violation of 18 U.S.C. 922(j) (ECF No. 17, Page ID. 40). Brown was sentenced to 92 months' imprisonment and 3 years' supervised release (ECF No. 20, Page ID.70).

Brown began serving his prison sentence on May 18, 2015, and is currently incarcerated at Canaan USP. He is 37 years old, and his projected release date is January 9, 2022. His underlying medical conditions are asthma; obesity; type II diabetes; hypertension and myocardial infarction.   Brown has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. On May 4, 2020, Brown requested compassionate release and/or release to home confinement based upon his medical conditions and concerns of Covid (Exhibit 3). On May 9, 2020, his request was denied (Exhibit 4).  On or about May 27, 2020, Brown filed a Request for Administrative Remedy with the BOP again seeking compassionate release or home confinement. His request for an administrative remedy was denied. On June 1, 2020, Brown requested compassionate release based

upon Covid and his medical conditions (Exhibit 5). On June 16, 2020, his request was denied on the basis that his medical conditions do not meet the criteria for release (Exhibit 5). Brown filed a *pro se* motion with this court on July 9, 2020 (ECF No. 21, Page ID. 76). On September 2, 2020, a supplemental brief was filed on his behalf by counsel (ECF No. 24, Page ID. 174).

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.*

6

When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from

Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.      The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7668 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it

should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise

inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at \*6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Brown's motion for compassionate release.

Brown's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States*

*v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

Brown has requested compassionate release/home confinement based upon Covid and his medical conditions. His request was denied by the BOP (Exhibits 4, 5).

### A.   Brown is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has

already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other

reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Brown and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Brown's medical records, however, establish that he has asthma; obesity; type II diabetes; hypertension and myocardial infarction - medical conditions, which the CDC has confirmed are risk factors that place a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with those medical conditions, Brown has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But Brown remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a

danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the

defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will

only increase if our community is faced with a sudden influx of convicted defendants.

Because Brown's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Brown has an extensive 20 year criminal history, which includes multiple convictions for violent crimes. His criminal history score at the time of his sentencing was 20, placing him in criminal history category VI, the highest category possible (PSR, ¶ 52). Brown was on parole at the time of his arrest. He has a pattern of parole and probation violations. Brown has been determined by the BOP to present a high risk of recidivism, partially based upon his history of violence and his prison disciplinary record (Exhibits 2, 7). His release prior to the expiration of his sentence would endanger public safety. Brown is not eligible for compassionate release.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15,

2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Brown eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstance of the offense committed by Brown heavily weigh against his release. On February 8, 2014, Brown shot up an unoccupied vehicle, which was parked in Ypsilanti, MI. Brown as the shooter (PSR, ¶ 10). Law enforcement went to Brown's apartment, and after searching the premises, found the loaded gun and ammunition. Subsequent ballistic testing verified that it was the same gun used in the vehicle shooting incident (PSR, ¶12). Brown's conduct evidences a complete disregard for the safety of others and respect for the property of others. While the motive or intention of the shooting was not discerned, the act itself was dangerous and jeopardizes public safety.

The second §3553 factor which greatly weighs against Brown's release is his own history and characteristics. Brown's criminal history has been detailed above, and includes numerous convictions for violent offenses. Despite serving short terms of

19

state jail time, his pattern of criminal conduct has continued. He has violated terms of his parole and probation, often by engaging in new criminal conduct (PSR, ¶41,42). While in federal custody he has been sanctioned for possessing drugs and alcohol by possessing a greeting card that contained amphetamines (Exhibit 2). Brown has not established a pattern of compliance, even while imprisoned. It is unlikely that he would do so if released.  This factor gains new importance during the Covid pandemic, as rules and medical protocols have been issued by the federal government and the state government to control the spread of the virus. *See, e.g.* Executive Order 2020-147: Masks (July 10, 2020)(executive order in Michigan mandating masks in indoor and outdoor contexts).  Releasing Brown at this time would jeopardize both his own health, and the health of the general public.

Additional §3553 factors which weigh against Brown's release are the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. 18 U.S.C. §3582(c)(1)(A); 18 U.S.C. §3553 (a)(2)(A). Brown was given a very favorable plea agreement by the government.   By pleading guilty to possession of a stolen firearm, he avoided the possibility of a mandatory minimum sentence as an armed career offender. Brown was sentenced to 92 months, the bottom of the applicable guideline range of 92-115 months (PSR, ¶ 79). His projected release date is January 9, 2022 (Exhibit 6). To grant him a further reduction in his sentence at this time, would not serve the goal of

reflecting the seriousness of his criminal conduct, promoting respect for the law or providing just punishment for the offense.

Release of Brown at this time would not afford adequate deterrence to criminal conduct and protect the public from further crimes by Brown. 18 U.S.C. §3553(a)(2)(B) and (C).  A reduction in his sentence at this time, would undermine its deterrent effect. Deterrence is important considering Brown's age of 37. While advanced age may be considered a deterrent to future and further criminal activity- that is not the case here. Brown is still relatively young. If Brown were to commit another felony, especially one involving violence or guns, he may be imprisoned for the remainder of his natural life.  Brown's behaviors constitute a continued risk to public safety and health, which weigh against compassionate release. 18 U.S.C. §3582(c)(1)(A); 18 U.S.C. §3553(a)(2)(C).

Brown simply does not have the extraordinary and compelling circumstances to warrant his early release. His medical conditions are not exceptional, and are being managed in prison. The facility at which he is presently housed Canaan, USP, is located in Waymart, PA. The facility houses 1,150 total inmates. Only 1 inmate has tested positive for the virus. Four staff have recovered.  This low number is likely due to the extensive precautions undertaken by the Canaan facility to mitigate the spread of Covid. Because there has been only one infected individual at the Canaan

facility, Brown's risk of exposure is too speculative to render the circumstances extraordinary and compelling.

### C.     The Court should decline Brown's request for a recommendation that he be granted home confinement.

The Court should also deny Brown's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to grant such a recommendation, Brown is not a strong candidate for it. His extensive criminal history, pattern of parole and probation violations and misconduct while in prison, demonstrate that he could not be trusted to abide by home confinement conditions if release.   The BOP has designated him as having a "high risk recidivism level" (Exhibit 7).  Brown's record thus suggests that his release into home confinement would quickly spiral into additional criminal conduct.

In addition, his proposed plan of residing with his fiancée and two small children in Ypsilanti, hardly seems appropriate (ECF No. 24, Page ID. 188). Brown has a dangerous  and violent criminal past. He proposes future employment with a lawn care service or Federal Express, however, claims to have had a "grave deterioration of his health" (ECF No. 24, Page ID.188) and says that his body "has broken down since he was incarcerated in this case" (ECF No. 24, Page ID. 186) .

### III. If the Court were to grant Brown's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Brown's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Brown's motion for compassionate release pursuant to §3582(c)(1)(A) should be denied.

MATTHEW SCHNEIDER
United States Attorney

s/Susan E. Fairchild  (P41908)
Assistant United States Attorney
211 W. Fort St., Suite  2001
Detroit, Michigan  48226
(313) 226-9577
E-mail: susan.fairchild@usdoj.gov

Dated: September 14, 2020

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system.


Todd Shanker, Attorney for Defendant Brown


<u>s/Susan E. Fairchild  (P41908)</u>
Assistant United States Attorney
211 W. Fort St., Suite  2001
Detroit, Michigan  48226
(313) 226-9577
E-mail: susan.fairchild@usdoj.gov